## WINDISCH & MUEHLHAUSER BREWING CO. ET AL. V. CLARA OPP.

1. PETITION SUFFICIENTLY CHALLENGING WILL NOT DEMURRABLE.

   As the only issue that can be submitted to the jury in an action to set aside a will is, whether the writing produced by the proponents is the last will of the testatrix, and the issue cannot be varied by the averments of the pleadings, if the petition sufficiently directs the attention of the court to the fact that the validity of the will is challenged, and that the proper parties are before it, the court is to submit that ן hase of the litigation to the jury. No matter what other causes of action may be asserted in the petition, or what other parties are drawn into the controversy by the pleading, and it is not error to overrule a demurrer to the petition raising the questions of its sufficiency, and of misjoinder.

2. FACTS AS TO MENTAL CONDITION OF TESTATOR MAY BE REMOTE AS TO TIME AND NOT AS TO THE ISSUE.

   The condition of the testator, at a time previous to making the will, when so followed by other manifestations of mental disturbance as to reflect some. light upon the condition of her mind at the time the will was signed, is admissible in evidence, whether such condition was at a long or short time previous thereto.

NORRIS, J.

The defendants in error were the plaintiffs, and the plaintiffs in error were the defendants in the court of common pleas.

The action was brought in the court below to set aside the will of one Ida E. Opp. The plaintiff, Clara Opp, and the defendants Dora Alspach, Wilbur Opp, Ida Opp, Blanch Opp, Hazel Opp are the only children and heirs at law of the testatrix, Ida E. Opp. Willoughby F. Opp was the husband and is the widower of Ida E. Opp, and is the sole legatee and devisee under her will.

The validity of the will is attacked in the amended petition of plaintiff, upon the ground that at the time the will was made, Ida E. Opp, from protracted illness, was mentally incapacitated, and was not of sound mind, and that she was coerced into signing the paper which purports to be her last will, by the influence of her said husband, Will-

oughby F. Opp; and by false representations made by him that said paper was not a will.

The other parties made defendants to the action, are parties who claim title to parts of the property to which Opp succeeded by this will, and who claim title under or through him.

To the amended petition a demurrer was filed by the Brewing Co. First: Upon the grounds that said pleading does not state facts sufficient to constitute a cause of action. Second: That several causes of action are improperly joined. The demurrer was overruled by the court below.

Answers are filed by the Brewing Co., Charlotte Fillwock and August Rusinger and others, setting up their respective titles, denying the salient allegations of the petition, asking that the will be sustained, and for such proceedings as may protect their interests and prevent loss. The other defendants do not answer.

The issue made upon the journal of the common pleas was, whether the writing mentioned in the petition is, or is not, the will of the testatrix, Ida E. Opp. This issue being submitted to a jury, resulted in a verdict not sustaining the will. The motions of the answering defendants for new trial were overruled, and the court entered judgment on the verdict. To reverse this proceeding the defendants except the Opps prosecute error.

The reasons assigned for reversal are, that the verdict is contrary to law, and is not sustained by sufficient evidence; error in admitting evidence over defendants' objection, and in rejecting evidence offered by the defendants, and error in overruling the demurrer to the amended petition.

As to the overruling of the demurrer.

The issue to be submitted, and the only issue that can be submitted to the jury in an action to set aside a will, is:

"Whether the writing produced by the proponents is the last will of the testatrix or not."

The issue to be tried having been prescribed by statute cannot be —says 52 Ohio St., 520—varied and restricted by averments in the pleadings. So it would appear that if the petition sufficiently directs the attention of the court to the fact that the validity of the will is challenged and that the proper parties are before it, the court submits that phase of the litigation to a jury, no matter what other causes of action may be asserted in the petition, or what other parties are drawn into the controversy by the pleadings. We think the demurrer was properly overruled.

The validity of this will is directly assaulted by the amended petition, and there was no other way but to submit the issue, as was done by the court.

As to the error assigned in the court admitting and rejecting evidence, it is held, 52 Ohio St., 519, "that the specific ground of contest to which the evidence relates need not—to render the evidence admissible —be alleged in the petition, but that any evidence—competent—tending to prove that, for any reason, this instrument in contest is not the valid will of the testatrix, is admissible."

There is no testimony in the record tending to show that Willoughby F. Opp falsely represented to the testatrix that the paper she was signing was not a will; so that ground of contest is not considered.

The reasons urged for the invalidity of this will are, that the testatrix was, at the time the paper was signed, of unsound mind to a degree that precluded testamentary capacity, and that she was coerced by the undue influence of her husband. And the evidence appears to have been directed to these grounds.

The first objection to evidence urged as error is found on page 5 of the bill of exceptions. About a month before she was taken with her last sickness, one of her younger children (Wilber) was away from the house during the prevalence of a heavy storm. This occurrence appears to have affected her strangely. The relation of it by the witness was objected to by defendants as remote, and the court admitted the testimony over the objection. As related by the witness, it appears the boy was away from the house during the storm, and that testatrix became very anxious and much excited, but when the boy returned safe she quieted down until evening, when her condition became so alarming to her family that a doctor was sent for; her mind was filled with vagaries and alarm. She imagined that her daughter Dora, the witness, Mrs. Alspach, was being killed at the schoolhouse. When Dora presented herself, the testatrix failed to recognize her, but still insisted that her hallucination was a reality; she then imagined that her son-in-law was being killed, and the next day tried to jump out of the window. The witness says from that time on she appeared on occasions to be flighty. She seemed to be very jealous of her husband, and would insist that he was away talking to some one else when he was standing before her. She imagined that her people from a distance were in the next room waiting for her, and wanted to go to them; at one time she claimed her step-son was going to kill her. This was a month before she took her last sickness, but from that time on she complained, says the witness. She would wrap herself in a heavy blanket, even though the weather was exceeding warm; she appeared gloomy, and in low spirits. About two weeks before his last sickness she made known her intentions of poisoning herself, and her preparations to do so were discovered by her family. And shortly after this she fancied her husband had been hurt in a fight and insisted on seeing blood on his face when there was no blood there. In ten days or two weeks, the disease which ended in her death manifested itself; and from this time she lived about eight days and she died on the 12th of October in the morning. We think that her condition at the time and immediately following the storm was so recently before her death and so followed by other manifestations of mental disturbance, as to reflect some light upon the condition of her mind at the time the will was signed, and facts that thus tend to enlighten the jury are admissible whether the dates of such manifestations are a long time or a short time before the making of the will. Such facts, though they may be remote as to time, are not remote to this issue.

On page 100 of the bill of exceptions is the cross-examination of Dr. Van Horn, who was called by the plaintiff as an expert. A series of questions had been put to him by counsel for defendants, as to the probability of erysipelas—of which disease the testatrix died—inducing delirium. After answering the question, he was asked, "whether or not a physician in charge of the case would know more about the condition of the patient, than a physician to whom a hypothetical question was put." The court sustained the plaintiff's objection to this question, and we think properly. The inquiry would involve and provoke investiga-

Windisch & Muehlhauser Brewing Co. et al. v. Opp.

tion as to the knowledge and experience and skill and judgment of the physician in charge, and the balance of the medical profession, and when answered would be but the opinion of a man who didn't know. And at any rate, his opinion (on the subject) was reached farther on.

The last ruling objected to is found on page 109 of the record. To Dr. Ewing, who was offered by plaintiffs as an expert, the condition of the testatrix for the week preceding her death had been described, and he was asked that, "if when she was well she was accustomed to drink beer, whether or not that fact would increase or diminish the probability of her being delirious in her last sickness." He answered, "that the fact that she drank beer at all would increase the probability." This answer was objected to, and the objection was overruled. We see no error in this. There is testimony tending to show that while in health preceding her last sickness she did drink beer, not to excess however, but the answer carries with it its own pertinency, and was properly allowed.

There is no objection to the charge, which is a clear exposition of the law of the case.

This woman died on the twelfth of October, Saturday morning, at 3 o'clock. Her disease was pronounced by the physicians to be erysipelas. It manifested itself on her face and head; it became noticeable on Friday 4th, and grew more virulent until it killed her. The will was signed on the Thursday before her death. At this time the testimony shows her head was swollen to nearly twice its natural size, and her eyes were nearly closed, she had the fever that naturally attended such a condition. On Monday she did not know her son Wilber, the boy whose real or fancied danger from the storm had so distracted her a month before. On Wednesday, she fancied that Mrs. McCall, a friend who had been long dead, was in the room with her. On Thursday forenoon, the day the will was signed, she imagined that her people from from Pennsylvania who were dead, sat in the next room waiting for her. A neighbor woman whom she well knew called to see her in the afternoon, and she did not recognize her. From the time the will was signed to her death she was generally quiet except when aroused to take medicine or nourishment, and then she fancied they were giving her poison.

For a time before the will was signed she did not take much notice of anything. She was an affectionate and attentive mother, yet she paid no attention to her children when they came to her. In the forenoon before the will was signed she did not know her neigbor, Mrs. Levan. She thought she was away from home, and was lost, and wanted to get home to her baby, yet when the baby was brought to her bed side, she didn't know it. Along between three and four o'clock of that day, she insisted on going home, tried to get out of bed and wanted to go home. She had made her will the same afternoon, and this appears to have been the true condition of this woman at and about the time the will was signed. She never got better, but grew worse from the day she was taken until she died. The Doctor, Dr. Gius, recognized the gravity of the situation early in the week, when he told Opp if he had any business to transact with her he had better be about it.

Opp is the sole legatee and devisee of this will, her children whom she appeared to love so well, the little son for whose safety she evinced such solicitude, the little baby from which in her delirium she fancied she was separated and to which she wanted to return, were not remembered in that will. It was a ready-made document when it reached her;

her husband had it prepared; her husband held her up in bed when she signed it. She barely assented to the questions put to her by a nod of the head or by a yes or a no.

Dr. Gius swears that he never saw her when she was delirious, and that he thinks she was of sound mind when she signed the paper. Mr. Phelps, who saw her only a few moments, says that from what he saw he thinks she was of sound mind.

The jury concluded that the woman when she signed that paper did not know what she was doing, and that she was not of deposing mind and memory, as defined to them in the excellent charge of the trial court. We cannot say the verdict was wrong, and finding no error in the record to the prejudice of plaintiff in error, affirm the judgment at costs of plaintiff in error, without penalty.

*James O. Troup*, for plaintiff in error.

*John Poe* and *Elisha Dunn*, for defendant in error.